U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
_____
                                              X
LEYDEN ROSA ROVELO, on behalf of herself      :
and all others similarly situated,            :
                                              :     Case No. 08CV01830
                        Plaintiff,            :     (RWS)
                                              :
            v.                                :
                                              :
FIDELITY NATIONAL TITLE INSURANCE,            :     CLASS ACTION
COMPANY, CHICAGO TITLE INSURANCE              :     COMPLAINT
COMPANY, TICOR TITLE INSURANCE                :
COMPANY, FIDELITY NATIONAL FINANCE,           :     JURY TRIAL
INC., FIRST AMERICAN TITLE INSURANCE          :     DEMANDED
COMPANY OF NEW YORK, UNITED GENERAL           :
TITLE INSURANCE COMPANY, FIRST AMERICAN       :
CORPORATION, COMMONWEALTH LAND                :
TITLE INSURANCE COMPANY, LAWYERS              :
TITLE INSURANCE CORPORATION, LANDAMERICA:
FINANCIAL GROUP, INC., STEWART TITLE          :
INSURANCE COMPANY, MONROE TITLE               :
INSURANCE CORPORATION, STEWART                :
INFORMATION SERVICES CORPORATION, and         :
INSURANCE RATE SERVICE ASSOCIATION, INC.,     :
                                              :
                        Defendants.           :
_____X
```

Plaintiff Leyden Rosa Rovelo ("plaintiff"), on behalf of herself and all others

similarly situated, upon knowledge with respect to her own acts and upon information

and belief with respect to all other matters, allege as follows:

## SUMMARY OF CLAIMS

1.      This case challenges as a *per se* illegal price-fixing agreement the

collective setting by defendants – which include the country's four largest title insurance

companies -- of the rates that consumers pay for title insurance in New York.

2.      Under the New York State Insurance Law ("Insurance Law"), title

insurance rates may be collectively set through a rate setting organization comprised of

the state's title insurers.  Pursuant to this law, defendants (along with other title insurers)

formed Title Insurance Rate Service Association, Inc. (TIRSA) in 1991.  TIRSA collects

from defendants and TIRSA's other members revenue and cost information and annually

submits it in aggregate form along with collectively set title insurance rates to the New

York Insurance Department ("Insurance Department").  Under this rate setting regime,

defendants have charged identical and collectively fixed rates to consumers since

TIRSA's inception.

      3.      The Insurance Department is supposed to carefully review the title rates

that defendants (through TIRSA) collectively fix.  However, defendants have made this

impossible by manipulating the rates so that they are principally based on costs over

which the Insurance Department has neither the authority nor the ability to meaningfully

review.  These costs are referred to as so-called "agency commissions."  They chiefly

cover kickbacks and other costs unrelated to the issuance of title insurance.  These

supposed costs are funneled to and through title agents to increase defendants' overall

revenues and get them more business.  The Insurance Department does not have

regulatory authority over title agents or their activities.

      4.      So, while the Insurance Department has authorized collective rate setting

activity generally, defendants have acted outside of this authority.  They have done so by

improperly including unregulated and unauthorized costs within their collectively set

rates.  And, they have embedded these supposed costs within the agency commissions

paid to title agents who are not licensed or otherwise subject to regulatory review by the

Insurance Department.  Indeed, the Insurance Department has unequivocally recognized

and publicly stated that it does not and can not evaluate these agency commissions.  Since

these payments typically account for roughly 85 percent of the total costs that go into TIRSA's rate calculation, defendants have effectively precluded the Insurance Department from actively supervising or conducting any kind of meaningful review of TIRSA's collective rate setting activity.

5.    Unchecked by competition or regulatory oversight, defendants have been able to collectively fix and maintain their title insurance rates in New York at supracompetitive levels. These rates – which for the average home or property purchaser are in the thousands of dollars – bear no reasonable relationship to the cost or expense of providing the insurance. And, they have been imposed on consumers who lack the knowledge and opportunity to challenge them.

6.    Plaintiff, on behalf of herself and a putative Class of all those similarly situated, brings this action under Section 1 of the Sherman Act to enjoin defendants' illegal price-fixing activity and recover damages for the illegal overcharges the Class has paid.

## JURISDICTION AND VENUE

7.    Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

8.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 because each defendant is a corporation that is found or transacts business in this district, and because a substantial portion of the affected trade and commerce described herein has been carried out in this district.

9.     The violations of antitrust law alleged herein have substantially affected interstate commerce.  Defendants sell title insurance throughout the United States collecting billions of dollars in premiums annually.

## THE PARTIES

10.     Plaintiff is a resident of Yonkers, New York.  During the Class Period as hereinafter defined plaintiff purchased title insurance from defendant Chicago Title Insurance Company ("Chicago Title") in connection with a refinancing of the mortgage on a property located in Yonkers, New York at a price that was artificially high because of defendants' unlawful price-fixing agreement.

11.     The Fidelity family of title insurance companies (collectively, "Fidelity") -- which includes defendant Fidelity Title, defendant Chicago Title, defendant Ticor Title Insurance Company ("Ticor Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York.  Fidelity accounts for roughly 31 percent of the title insurance premiums consumers pay in New York, which in 2006 amounted to roughly $361 million.  Nationally, Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly $4.6 billion.  Fidelity Title, Chicago Title, and Ticor Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

12.     Fidelity Title, Chicago Title, Ticor Title, and their affiliates are wholly-owned and controlled by defendant Fidelity National Finance, Inc. ("Fidelity National"), a Delaware corporation headquartered in Jacksonville, Florida.  Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims

management services.  Fidelity engaged in the conduct challenged herein with the approval and assent of Fidelity National.

13.    The First American family of title insurance companies (collectively, "First American") – which includes defendant First American Title Insurance Company of New York ("First American Title"), defendant United General Title Insurance Company ("United General Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York.  First American accounts for roughly 25 percent of the title insurance premiums consumers pay in New York, which in 2006 amounted to roughly $290 million.  Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion.  First American Title and United General Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

14.    First American Title, United General Title, and their affiliates are wholly-owned and controlled by defendant First American Corporation ("FAC"), a California corporation headquartered in Santa Ana, California.  Through its subsidiaries, FAC is a provider of title insurance, business information, and related products and services.  FAC had 2006 revenues of roughly $8.5 billion.  First America engaged in the conduct challenged herein with the approval and assent of FAC.

15.    The LandAmerica family of title insurance companies (collectively, "LandAmerica") – which includes defendant Commonwealth Land Title Insurance Company ("Commonwealth"), defendant Lawyers Title Insurance Corporation ("Lawyers Title"), and their affiliates – is engaged in selling title insurance to purchasers

of commercial and residential real estate throughout the United States, including New York. LandAmerica accounts for roughly 22 percent of title insurance premiums consumers pay in New York, which in 2006 amounted to roughly $258 million. Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion. Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

16.    Commonwealth and Lawyers Title are wholly-owned and controlled by defendant LandAmerica Financial Group, Inc. ("LAFG"), a Virginia corporation headquartered in Glen Allen, Virginia. Through its subsidiaries, LAFG is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate. LAFG had 2006 revenues of roughly $4 billion. LandAmerica engaged in the conduct challenged herein with the approval and assent of LAFG.

17.    The Stewart family of title insurance companies (collectively, "Stewart") – which includes defendant Stewart Title, defendant Monroe Title Insurance Corporation ("Monroe Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York. Stewart accounts for roughly 14 percent of the title insurance premiums consumers pay in New York, which in 2006 amounted to roughly $168 million. Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006 amounted to roughly $2 billion. Stewart Title and Monroe Title were founding

6

members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

18.    Stewart Title and Monroe Title are wholly-owned and controlled by defendant Stewart Information Services Corporation ("SISC"), a Delaware corporation headquartered in Houston, Texas.  Through its subsidiaries, SISC is a provider of title insurance and related information and post-closing lender services.  SISC had 2006 revenues of roughly $2.5 billion.  Stewart engaged in the conduct challenged herein with the approval and assent of SISC.

19.    Together, Fidelity, First American, Commonwealth and Stewart account for more than 90 percent of the title premiums consumers pay in New York, which in 2006 amounted to roughly $1.1 billion.  Nationally, they account for more than 85 percent of title premiums, which in 2006 amounted to roughly $14.5 billion.  Throughout the relevant damages period, defendants charged New York consumers identical title insurance rates that were collectively set through TIRSA.

20.    Defendant TIRSA is a voluntary association of title insurers licensed as a rate service organization pursuant to Article 23 of the Insurance Law.  TIRSA maintains its offices in New York City, which until recently were located at the same New York address of defendant Fidelity Title.

21.    TIRSA annually compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the Insurance Department.  TIRSA also prepares and submits the New York Title Insurance Rate Manual which sets forth title rates to be charged and rules to

be followed by TIRSA's members.  The Insurance Department has never objected to any of the rates TIRSA has collectively set.

22.    TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York.  Currently, Fidelity, First American, LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members.  As such, they comprise a majority voting block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

## DETAILED FACTUAL ALLEGATIONS

A.    The Market for Title Insurance in New York

23.    Title insurance is one of the most costly items associated with the closing of a real estate transaction.  In New York, TIRSA's collectively fixed rates for title insurance are based on a percentage of the total value of the property being insured and can range from less than $1,000 to as much as tens of thousands of dollars.  In 2006 alone, New York consumers paid roughly $1.2 billion for title insurance, most of which went to defendants and their affiliates.  This amount has risen dramatically over the past decade, more than quadrupling the roughly $260 million in insurance premiums that New York consumers paid in 1996.

24.    Title insurance serves an important purpose.  It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property and with the ultimate right to resell the property.  In New York, title insurance is required by lenders in most residential and commercial real estate transactions.

25.    Despite the importance and high cost of title insurance, consumers have little understanding of the product, the purpose it serves, and the reasonableness of the price they pay for it. They also exercise little discretion in choosing the title insurer from which they purchase the insurance. That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor. Consequently, for most purchasers, the cost of title insurance is largely overlooked and seldom, if ever, challenged. Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction. Usually the consumer does not "shop around" or negotiate with respect to the price of the insurance coverage.

26.    Due to this lack of a competitive environment, title insurers have little or no incentive to compete with respect to price.

27.    The most effective way for a particular title insurer to get business is to encourage those making the purchasing decisions – typically lawyers, brokers or lenders servicing a customer – to steer business to that insurer. One way to so motivate these third-party representatives is through kickbacks in the form of finder's fees, gifts, and other financial enticements. Therefore, it is higher pricing (which allows for payments to referring parties), not lower pricing or competing on the basis of price, that provides the best way for title insurers to compete and increase their business.

28.    The lack of competition on the basis of price that characterizes the title insurance industry, coupled with the particular vulnerability of most title insurance consumers, has led most states to regulate the industry. However, New York is only one of a very small number of states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA. And, it may be the only state in

which the collectively set rates include "agency commissions" that are neither authorized nor regulated, and which makes up the lion's share of the title insurance rates.

29.    There are two principal cost components that go into TIRSA's rate calculation. One comprises the risk associated with issuing the title policy. The other comprises the "agency commissions" paid to title agents.

30.    The risk component covers the risk the title insurer bears for any undiscovered defects in the title. Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer. That is because the title insurance protects against *prior* events that cause defects in title. With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policy amounts to only about 5 percent of the total premium collected. It is even lower in New York. This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

31.    The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk and title insurers typically outsource this task to title agents.

32.    The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

33.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premium is based on the so-called "costs" associated with the payment of agency commissions. Only 15 percent is based on costs associated with the risk of loss. TIRSA publishes its final calculated title rates in the New York Title Insurance Rate Manual. These rates are tied to the value of the property being insured. This is so despite the fact that the costs associated with agency commissions are entirely unrelated to the value of the property. Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value – proportional to property value or otherwise – to the consumer. Even search and exam costs are unrelated to property value. They instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

B.    TIRSA

34.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting bureaus in many other states, was disbanded in the mid-1980's in the wake of a Federal Trade Commission ("FTC") challenge to the collective rate setting

activity of many of these associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992), where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting activity of these rating bureaus must be actively supervised by the state.

35.    In *Ticor*, like here, the FTC focused its challenge on agency commissions. The FTC contended that the respective state insurance departments merely rubber-stamped this portion of the collectively fixed rates without any independent review or analysis of their reasonableness or cost justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to "exercise[] sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

36.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in *Ticor Title Ins. Co. v. FTC*, 998 F. 2d 1129 (3d Cir. 1993), upheld the FTC's finding that the collective rate-setting of certain state rating bureaus was improper because it was not actively supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not enough. Active supervision requires the state regulatory authorities' independent review and approval." *Id*. at 1139.

37.    Defendants formulated TIRSA's first rate manual and procedure soon after the Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme to get around the rigors of state oversight required by *Ticor*. They have

done so by calculating a single rate that comprises both risk and agency commission costs and by outsourcing to title agents the agency commission costs.  In this way, defendants avoid providing the Insurance Department with any detailed breakout or backup for the bulk of the costs that make up their collectively fixed rates.

38.     TIRSA merely submits an aggregated figure that is supposed to represent the total agency commission costs.  Embedded within this figure is the vast quantity of dollars that are funneled to and through the title agencies as kickbacks, financial inducements and other costs unrelated to the issuance of title insurance.  Defendants' design in all of this has been to effectively "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

C.     New York Has Not Actively Supervised TIRSA And Its Collectively Fixed Rates.

39.     There is no provision under the Insurance Law for TIRSA to include in its collectively fixed rates kickbacks and other agency commission payments unrelated to the issuance of title insurance.  Indeed, the Insurance Department has publicly stated that it lacks the authority to review any agency commission payments.  It has likewise recognized that defendants' outsourcing of agency commission costs has prevented it from performing a meaningful review of TIRSA's calculated rates.  This was made clear at a November 2006 public hearing the Insurance Department held – the first in 15 years – where it questioned TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup or detail for agency commissions.

40.     Through this questioning, the head of TIRSA admitted that neither TIRSA nor its members have any idea of what their agency commission costs actually cover:

**Q**. At the same time you've also testified that your members really don't know what the title agents are doing with the money that they're getting, in other words, they give them 85 percent and as far as they know they have no input or no knowledge of what's being done with the money, I just want to make sure, is that correct? (*Mark Presser, Assistant Deputy Superintendent of Ins. Dept.*)

**A**. I have no way of knowing…what their [the title agents'] expenses are, what their overheads are, what they pay in salaries, what they pay in administrative costs, what they pay in rent and what they pay with every other aspect of their overhead, I have no way of knowing that. (*David Skidikman, Executive Director of TIRSA*)

\* \* \*

**Q**. I'm just getting at the point that a large portion of the data represents revenue and expenses that are outside the control of the [insurer] and outside the control of TIRSA and you have no specific knowledge as to how those dollars are being expended, as you just said? (*Assistant Deputy Superintendent of Ins. Dept.*)

**A**. That's correct. (Executive Director of TIRSA)

41.    The head of TIRSA further admitted that TIRSA does not even know the actual search and exam costs incurred by title agents on behalf of TIRSA's members:

**Q**. What are the actual costs to title insurers to the agents to do the necessary searches and all the other things that they need to do in connection with a title search? (*Howard Mills, Superintendent of Ins. Dept.*)

**A**. We do not get the agents' statistics because that is between the [insurer] and the agent. (*Executive Director of TIRSA*)

42.    From this and other testimony at the hearing, the Insurance Department conceded that it could not properly evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost information on agency commissions that TIRSA does not provide:

> **Q.** It seems to me that looking at costs, since this piece is such a significant portion of what the rate is and that's part of what goes into the rate, it seems like that is really an area of inquiry that we should be making to understand what goes into that cost factor. I think that's really an area we need to explore. I don't know how to do that. It seems like it's a significant piece and it doesn't seem like anyone is really telling us what goes into that. Would you agree that that's something we need to explore as part of the rates? (*Joseph Risi, Deputy Superintendent and General Counsel of Ins. Dept.*)

> **A.** Now, TIRSA, as an organization, has no control or no dealing with the agents, we deal only with the [insurers]. So we have no way of knowing what the cost basis is certainly for the agents . . . . (*Executive Director of TIRSA*).

43.     Even defendant LAFG of the LandAmerica family echoed this recognition that there can be no meaningful review of TIRSA's calculated rates without first understanding the agency commission costs that make up roughly 85 percent of these rates:

> **Q.** If you don't look at the expenses of the agents, if you don't really do an analysis of their costs…, how do you know the profit they're making is reasonable… if you or no one else delves into what they're actually spending the 85 percent on? (*Assistant Deputy Superintendent of Ins. Dept.*)

> **A.** That's a good question…. (Bruce Wright, *Senior Vice President of LAFG*)

44.     The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in dire need of greater state regulation. The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations*, needed to analyze premium prices and underlying costs." (emphasis added)

45.     To remedy this failing, GAO has proposed, among other things: 1) strengthening the regulation of title agents through means such as establishing meaningful requirements of capitalization, licensing, and continuing education; and 2) improving the oversight of title agents through more detailed audits and the collection of data that would allow in-depth analyses of agents' costs and revenues.

46.     The Insurance Department has recently tried to take its first steps in this direction of more active oversight by proposing legislation that would impose a licensing requirement on title agents. This legislation is currently pending before the New York legislature. If enacted, it would bring title agents under the regulatory authority of the Insurance Department for the first time. This would seemingly provide some assistance in filling the regulatory vacuum that currently exists with regard to title agency costs.

47.     However, even if the legislature expands the Insurance Department's authority in this way, this alone will not be enough to solve the problem. As the GAO report found, there are significant regulatory lapses even in those states that have licensing requirements for title agents:

> only two of the six regulators we reviewed collected financial and operational data on title agents, and regulatory officials in both those states said that the data they currently collect was insufficient to analyze the appropriateness of [title] rates.

48.     In any event, the Insurance Department's call for legislature assistance in regulating title agents and reviewing their agency commissions further highlights the fact that it currently has neither the authority nor the ability to properly assess defendants' collectively fixed rates.

49.     Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supracompetitive

levels and earn profits that vastly exceed those contemplated by the Insurance Department or that would have resulted in a free and lawfully operating competitive market.

D.    Defendants Have Collected Supracompetitive Profits

50.    At the time of TIRSA's formation, the Insurance Department established 5 percent (of the total premium) as the level of profit to which title insurers are entitled. The Insurance Department is supposed to carefully analyze TIRSA's rate calculations, and in particular, its revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a reasonable premium. However, without the authority or ability to scrutinize agency commission costs, the Insurance Department has been unable to perform this function. As a result, defendants (through TIRSA) have been able to set artificially high title premiums and secure title profits far in excess of the 5 percent threshold.

51.    Through an independent investigation it conducted over the past several years, the New York State Attorney General confirmed defendants' excess profits in this regard. It found that for every dollar of insurance premium defendants collect, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid out in claims. And, of the roughly 85 cents that supposedly covers agency commissions, only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy. These numbers show that TIRSA's collectively fixed rates have resulted in profits that vastly exceed the 5 percent profit level the Insurance Department prescribed.

52.    The Attorney General's investigation further revealed that what was largely driving these bloated numbers were the kickbacks and other financial

inducements defendants were funneling to and through title agents to secure more business. As reported at the Insurance Department's 2006 hearing, one title agency's financial statements revealed that it spent more than $1 million of these so called "agency commissions" on items identified as "Christmas," "automobile expenses," "political contributions," "promotional expenses," and "travel and entertainment." These expenses are not even remotely related to the issuance of title insurance.

53.    As one Assistant Attorney General involved in the investigation explained at the hearing: "In essence, what is really happening is that the title insurance companies are paying the title agent for referring business to them." The Attorney General's office concluded that "all this excess money paid to the title agents by the title insurance company is a referral fee in violation of New York's Anti-kickback Law."

54.    Numerous industry participants involved in the hearing corroborated the Attorney General's findings of rampant kickbacks and inflated premiums. As one title agent for defendant Chicago Title conceded: "Right now the title companies and some agents use the fees as a marketing tool to get business. Long gone are the days of a lunch and round of golf. Today it is 40, 50, 60, 70 percent of title premium for little or no work being performed."

55.    Another title agent for Chicago Title (as well as for defendants Fidelity Title, Ticor Title, First American Title, and Commonwealth) described the industry as having a "rampant culture of illegal kickbacks."

56.    The former President of the New York State Land Title Association summed it up in this way. "Lets face it: there are no 'rules' governing title agencies in

New York. Steering, kickbacks and referrals are open and notorious – often aided and abetted by underwriters [the title insurers]."

57.     All of this "excess money" paid to title agents not only works to steer business to defendants. It also serves to boost defendants' own profits through the inflated revenues they obtain to cover these agency payments and through their ownership or management stake in many of these agencies.

58.     At the Insurance Department Hearing, the Assistant Attorney General rhetorically questioned how defendants could have accomplished such a regulatory run-around: "how could this happen . . . why [are] the title insurance companies and the title agents in New York able to reap such large profits?" The answer lies in defendants' scheme to set up a veritable "black box" of inflated costs and revenues into which the Insurance Department has neither the authority nor the ability to penetrate.

## ANTICOMPETITIVE CONDUCT

59.     Defendants are competitors in the sale of title insurance to consumers in New York. Through TIRSA, these title insurers have agreed and engaged in concerted efforts to (i) collectively set and charge uniform and supracompetitive rates for title insurance in New York, (ii) include in their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the Insurance Department has no regulatory authority.

60.    In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance in New York and is a *per se* violation of Section 1 of the Sherman Act.

61.    Defendants' price-fixing activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through TIRSA's submissions to the Insurance Department of supposed cost and revenue information and its periodic submissions of rate changes.

62.    Through their collective price-fixing and manipulation of the regulatory process, defendants have harmed competition by charging consumers supracompetitive prices for title insurance in New York.

63.    New York's title insurance rates are among the highest in the country. According to rate comparisons made by Bankrate.com, one of the country's leading aggregators of financial rate information, New York title rates (based on insuring a property with a $200,000 mortgage) are roughly 67 percent higher than the national average. The gap is even greater with many of New York's Northeast neighbors including Massachusetts (70%), Maryland (76%), Vermont (81%), Delaware (83%), Maine (85%), Washington D.C. (87%), and New Hampshire (111%).

64.    Defendant First American's own rate comparisons further confirm the vastly inflated title rates in New York compared to the rest of the country. First American's calculations (based on a $200,000 mortgage) show that New York title rates are roughly 45% higher than the national average. First American's calculations show that this gap is even greater – approaching or exceeding 100% -- as compared to the rates

for many of New York's neighbors (including Massachusetts, Maryland, Vermont, Maine and New Hampshire).

65.    Absent defendants' illegal conduct, New York consumers would have paid significantly less for title insurance. These prices would have been more in line with the significantly lower prices charged by title insurers in these other states where the challenged price-fixing activity has not occurred.

### CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action as a class action under rule 23(b)(3) of the Federal Rules of Civil Procedure for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Rule (b)(3) Class is comprised of all consumers who purchased title insurance in New York from defendants or TIRSA's other members during the fullest period permitted by the applicable statue of limitations

67.    Plaintiff, along with all other members of the Rule (b)(3) Class, was injured as a result of paying supracompetitive prices for title insurance in New York. These supracompetitive prices were achieved as a result of defendants' illegal price-fixing activities. Defendants are jointly and severally liable for the illegal price-fixing activities of all members of TIRSA.

68.    Members of the (b)(3) Class include hundreds of thousands, if not millions, of consumers. Class members are so numerous that their joinder would be impracticable.

69.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and New York General Business Law Section 349. The Rule (b)(2) Class

includes all members of the (b)(3) Class, and all consumers who are threatened with injury by the anticompetitive conduct detailed herein.

70.    Defendants have acted, continued to act, refused to act and continued to refuse to act on grounds applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

71.    Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of consumers. They are so numerous that their joinder would be impracticable.

72.    Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law or fact common to the class are the following:

- Whether defendants have engaged in the alleged illegal price-fixing activity;

- The duration and scope of defendants' alleged illegal price-fixing activity;

- Whether defendants' alleged illegal price-fixing has caused higher prices to plaintiff and other purchasers of title insurance in New York;

- Whether the Insurance Department has actively supervised defendants' collective rate-setting activity; and

- The extent to which defendants' unlawful activities artificially inflated title insurance rates.

73.    Plaintiff does not have any conflict of interest with other Class members. Plaintiff's claims are typical of the claims of the Class and plaintiff will fairly and adequately reflect the interests of the Class. Plaintiff has retained counsel competent and experienced in class action and other complex litigation to represent the Class.

74.    This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Class are small in

relation to the expense and burden of individual litigation and therefore it is highly

impractical for such Class members to seek redress for damages resulting from

defendants' anticompetitive conduct.

75.    There will be no extraordinary difficulty in the management of the Class

action.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINST ALL DEFENDANTS FOR PER SE PRICE FIXING

(Sherman Act Section I – *Per Se* Unlawful Horizontal Price-Fixing)

76.    Plaintiff repeats and realleges each and every allegation of this complaint

as if fully set forth herein.

77.    Defendants have entered into a continuing illegal contract, combination, or

conspiracy in restraint of trade, the purpose and effect of which is to fix and maintain

supracompetitive prices to consumers for title insurance in New York.  This contract,

combination, and conspiracy is illegal *per se* under Section 1 of the Sherman Act, 15

U.S.C. § 1.

78.    Defendants' contract, combination, or conspiracy is comprised of

defendants' efforts and agreement to (i) collectively fix uniform and supracompetitive

rates for title insurance in New York, (ii) include in their calculated rates agency

commission costs, (iii) embed within these costs payoffs, kickbacks, and other charges to

title agents that are unrelated to the issuance of title insurance, and (iv) hide these

supposed costs from regulatory scrutiny by funneling them to and through title agents.

79.    Defendants' contract, combination, or conspiracy has caused substantial

anticompetitive effects in the title insurance market.  It has done so by causing plaintiff,

and other purchasers of title insurance in New York, to pay significantly more for title insurance than they would have in the absence of defendants' illegal activity.

80.    As a result of these violations of Section 1 of the Sherman Act, plaintiff and the purported Class have been injured in their business and property in an amount not presently known, but which is, at a minimum, hundreds of millions dollars, prior to trebling.

81.    Such violations and the effects thereof are continuing and will continue unless injunctive relief is granted.  Plaintiff has no adequate remedy at law.

### AS AND FOR A SECOND CAUSE OF ACTION
### AGAINST ALL DEFENDANTS FOR VIOLATION OF
### NEW YORK GENERAL BUSINESS LAW 349

82.    Plaintiff repeats and realleges each of her previous allegations as though fully set forth herein.

83.    GBL Section 349 provides in part as follows:

(a)    Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful

* * *

(b)    In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, which ever is greater, or both such actions.  The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

84.      Defendants, by engaging in the conduct described above, have committed deceptive acts and practices in the conduct of their business and have violated and continue to violate GBL Section 349.

85.      These violations occurred in whole or in substantial part in the State of New York.

86.      As a result of defendants' deceptive acts and practices, plaintiff and the Class have suffered, and will continue to suffer, substantial injuries and damages for which defendant is liable.

87.      Unless enjoined from doing so, defendant will likely continue to violate this statute, for which violations plaintiff has no adequate remedy at law.

## DEMAND FOR JURY TRIAL

88.      Plaintiff demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff and the Class request the following relief:

A.      That the Court declare, adjudge, and decree that defendants have committed the violations of federal law alleged herein;

B.      That defendants, their directors, officers, employees, agents, successors, and assigns be permanently enjoined and restrained from, in any manner, directly or indirectly, unlawfully fixing or maintaining their title insurance rates at supracompetitive levels, and committing any other violations of Section 1 of the Sherman Act, Section 349 of the New York General Business Law, and/or of other statutes having a similar purpose and effect;

C.    That the Court award damages sustained by Class members from defendants' violations of Section 1 of the Sherman Act in an amount to be proven at trial, to be trebled according to law, plus interest (including prejudgment interest), to compensate them for the overcharges they incurred;

D.    That the Court award damages in an amount to be determined at trial, in a sum equal to plaintiffs' actual damages, or fifty dollars, whichever is greater, for each separate violation of deceptive trade practices laws alleged herein, pursuant to GBL Sec. 349(h);

E.    That the Court award the Class attorneys' fees and costs of suit pursuant to GBL Secs. 340.5 and 349(h), and grant such other and further relief as the court may deem just and proper.

Dated:    New York, New York
          February 22, 2008

    LAW OFFICE OF
    CHRISTOPHER J. GRAY, P.C.

    By: _____
    Christopher J. Gray (CG 0334)
    460 Park Avenue, 21ST Floor
    New York, NY 10022
    (212) 838-3221

    LOUIS F. BURKE, P.C.

    By: _____
    Louis F. Burke (LB 4686)
    Lesli Wybiral (LW 0629)
    460 Park Avenue, 21ST Floor
    New York, NY 10022
    (212) 682-1700

    *Attorneys for Plaintiff*

Of Counsel

Krisha B. Narine, Esq.
Law Office of Krishna B. Narine
2600 Philmont Avenue
Huntingdon Valley, PA 19006
(215) 914-2460